UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RONALD W. KISER,

        Plaintiff,                          Case No.  1:16-CV-882

v.

                                             HON. ROBERT J. JONKER

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant,
_____/

## OPINION

        This is a social security action brought under 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration (Commissioner) denying Plaintiff's claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act.

## STANDARD OF REVIEW

        The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever evidence in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was forty-three years of age on the date of the ALJ's decision. (PageID.47, 134, 145.) He left high school in the tenth grade, but subsequently earned his GED. (PageID.79, 254.) Plaintiff has previously been employed as an order clerk, loan clerk, and as a floral designer. (PageID.124–125.) Plaintiff applied for benefits on February 26, 2013, alleging disability beginning February 28, 2011, due to bipolar disorder, schizophrenia, anxiety disorder, ADHD, and prominent

schizopersonality traits. (PageID.134, 145, 212–226.) These applications were denied on June 4, 2013, after which time Plaintiff requested a hearing before an ALJ. (PageID.159–168.) On January 13, 2015, Plaintiff appeared with his counsel before ALJ William Leland for an administrative hearing at which time Plaintiff, Ms. Cathy Groh (Plaintiff's mother) and a vocational expert (VE) all testified. (PageID.70–132.) On January 22, 2015, the ALJ issued an unfavorable written decision that concluded Plaintiff was not disabled. (PageID.47–69.) On May 12, 2016, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision in the matter. (PageID.42–45.) Plaintiff subsequently initiated this action under 42 U.S.C. § 405(g).

## ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c) 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d), 416.20(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed. (20 C.F.R. §§ 404.1520(f), 416.920(f)).

nonexertional impairment as well as an exertional impairment, both are considered in determining the claimant's residual functional capacity (RFC). *See* 20 C.F.R. §§ 404.1545, 416.945.

Plaintiff has the burden of proving the existence and severity of limitations caused by his impairments and that he is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

ALJ Leland determined Plaintiff's claim failed at step five. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (PageID.52.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of depression, bipolar disorder, schizoaffective personality, anxiety disorder, post-traumatic stress disorder, and attention deficit disorder. (PageID.52–53.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (PageID.53–55.) At step four, the ALJ determined Plaintiff retained the RFC based on all the impairments:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine, and repetitive tasks but not at production rate pace such as assembly line work. He is limited to simple work related decisions. The claimant can occasionally respond appropriately to supervisors, co-workers and the public. He is limited to simple work related decisions in dealing with changes in the work setting. Additionally, time off task can be accommodated by normal breaks.

(PageID.55–56.) Continuing with the fourth step, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. (PageID.63.) At the fifth step, the ALJ questioned the VE

to determine whether a significant number of jobs exist in the economy that Plaintiff could perform given his limitations. *See Richardson*, 735 F.2d at 964. The VE testified that Plaintiff could perform work in the following representative jobs: laundry laborer (2,000 regional and 100,000 national positions), dryer attendant (1,000 regional and 50,000 national positions), and general helper (2,000 regional and 150,000 national positions). (PageID.125–126.) Based on this record, the ALJ found that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy. (PageID.64.)

Accordingly, the ALJ concluded that Plaintiff was not disabled from February 28, 2011, the alleged disability onset date, through January 22, 2015, the date of decision. (PageID.64–65.)

## DISCUSSION

Plaintiff raises a number of issues that all touch on, to some degree, the ALJ's evaluation of an opinion from Dr. Kameswara Tatineni, Plaintiff's treating psychiatrist. Accordingly, the Court begins by addressing Plaintiff's argument that the ALJ's treatment of the opinion fails to satisfy the treating physician rule.

### 1.    The ALJ's Evaluation of the Treating Physician Opinion.

On January 5, 2015, Dr. Tatineni responded to prepared questions that addressed Plaintiff's impairments and limitations. (PageID.629–631.) On the same date, the doctor gave a written declaration, in Q & A format, that provided some explanation for the limitations he provided. (PageID.681–685.) In both the worksheet and in the declaration, Dr. Tatineni reported that Plaintiff was more limited than as the ALJ ultimately concluded. The ALJ concluded that the opinion did not

merit "much weight." (PageID.61.) Plaintiff argues that he is entitled to relief on the ground that the ALJ failed to articulate good reasons for discounting the opinion of his treating physician.

## A. The Treating Physician Doctrine Generally.

By way of background, the treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating physician if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375–76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527). It is undisputed that Dr. Tatineni offered an opinion that was subject to the treating physician doctrine.

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health & Human Servs.*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller*, 1991 WL 229979 at *2 (citing *Shavers,* 839 F.2d at 235 n.1); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286–87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and

the reasons for that weight." *Id.* This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "'are not well-supported by any objective findings' and are 'inconsistent with other credible evidence'" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Id.* at 376–77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Gayheart*, 710 F.3d at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinoin with the record as a whole; (5) the specialization of the treating source; and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 F. App'x 448, 450 (5th Cir. 2007).

### B.     *Dr. Tatineni's Assessment.*

On the completed worksheet, Dr. Tatineni first responded to questions concerning the mental abilities and aptitudes that were needed to do unskilled work. The worksheet listed sixteen different abilities, and asked the doctor to indicate Plaintiff's limitations in one of five provided categories: being unlimited or very good, limited but satisfactory, seriously limited, unable

to meet competitive standards, and no useful ability to function.[2]  Dr. Tatineni checked boxes indicating Plaintiff had no useful ability to function in two areas, was unable to meet competitive standards in nine areas, was seriously limited in two areas, was limited but satisfactory in two areas, and had no limitation in one area.  (PageID.629–630.)

The doctor then described Plaintiff's functional limitations in four areas that are commonly known as the "paragraph b" criteria of a listed mental impairment.  Dr. Tatineni noted that Plaintiff had marked restrictions in activities of daily living, extreme difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, and had experienced no episodes of decompensation of extended duration within a twelve month period.[3] (PageID.630.)  Finally, the doctor indicated that were Plaintiff to work, he would expect Plaintiff to be absent more than four days each month and further stated that Plaintiff was incapable of managing benefits in his best interest.  (PageID.631.)

---

[2] The worksheet defined these limitations as follows:

- *Limited but satisfactory* means your patient has noticeable difficulty (e.g., distracted from job activity) no more than 10 percent of the workday or work week.
- *Seriously limited* means your patient has noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday or work week.
- *Unable to meet competitive standards* means your patient has noticeable difficulty (e.g., distracted from job activity) from 21 to 40 percent or the workday or work week.
- *No useful ability to function*, an extreme limitation, means your patient cannot perform this activity on a regular, reliable and sustained schedule in a regular work setting.

[3] In order to satisfy the severity requirements of paragraph b, a claimant must demonstrate two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extend duration.

*See, e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.  Accordingly, Dr. Tatineni found that Plaintiff's impairments satisfied the paragraph b criteria.

After summarizing Dr. Tatineni's opinion, the ALJ concluded that it was not entitled to much weight as it was inconsistent with the treatment records. (PageID.61.) Plaintiff claims that the ALJ's reasoning is unsupported by substantial evidence because the ALJ focused on a few "isolated incidents as though they signified a substantial change or improvement in [Plaintiff's] functioning." (PageID.780.) Based on this record, the Court agrees. The medical record includes an unbroken litany of serious mental health problems beginning as early as 1991 that are fully consistent with Dr. Tatineni's opinions. The ALJ's discussion of these opinions appears to rest on a few isolated islands of normalcy along the way. This is insufficient to meet the *Gayheart* standard.

### i.    *Pre-Onset Records.*

Prior to Plaintiff's alleged onset date, Plaintiff sought treatment for emotional problems in February and March 1991 on the advice of his attorney, though he also had felt for some time that he needed counseling. (PageID.313.) A mental examination found that Plaintiff was functioning at the low end of the normal range of intellectual capabilities. The examiner noted that the results may have been skewed due to Plaintiff's acute emotional stress at the time. The test results also indicated that Plaintiff was in an acute and severe depressive state and that Plaintiff also had passive aggressive behavioral traits. He further was in a highly confused anxiety state, had a low self esteem, and a low self worth. The examiner diagnosed Plaintiff with major depressive disorder with psychotic features, a generalized anxiety disorder, and schizotypal personality disorder with prominent schizoid personality traits. (PageID.314–315.) The examiner also assigned Plaintiff a

GAF score of 60.[4]  In August 1991, Plaintiff attempted suicide by slashing his wrists.  (PageID.580.) At that time, Plaintiff was incarcerated because of a conviction for criminal sexual conduct with a family member.  Plaintiff reported he slashed his wrists because he got more depressed after being in placed in isolation.  (PageID.580.)  Plaintiff reported tossing and turning at night and thinking that people were out to get him.  (PageID.580.)

In 1994, Plaintiff was treated at Riverwood Community Mental Health Center as part of his probation. (PageID.582, 588.)   Plaintiff reported symptoms of depression and insomnia.  He also complained of a lack of energy.  He would mope around, and did not do what he knew he should do.  When he was around others, he felt that they might attack him.  (PageID.582.)  It was noted that Plaintiff tended to worry to excess and also had difficulty concentrating.  (PageID.582.) Plaintiff was observed to be alert, cooperative, and in contact with the environment.  Productivity and spontaneity were within the normal range, and there was no disturbance in thought association.  Plaintiff's paranoia appeared to be subjective only, but his memory was a problem as he had to write things down or he would forget.  His judgment appeared to be intact, and his intellectual capacity was above average.  (PageID.582.)  Plaintiff was prescribed a trial dose of Adapin.  (PageID.583.)

---

[4] The Global Assessment of Functioning or "GAF" score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR), (4th ed., text rev., 2000), pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id.* at 32. The GAF scale ranges from 100 to 1. *Id.* at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." *Id.* At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.*  A GAF score of sixty indicates that Plaintiff had "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV–TR at 34 (capitalization and boldface omitted).

In 1996, Plaintiff was evaluated for attention deficit disorder (ADD). Plaintiff reported that when he was in school he had difficulty with concentration and organization and increasingly had became socially withdrawn. The examiner also noted Plaintiff's employment history was sporadic, and that he would change jobs frequently. (PageID.316.) On examination, Plaintiff was cooperative and readily related to the examiner, but he had a fluctuating affect which suggested to the examiner the presence of anxiety mixed with depression. (PageID.317.) Testing resulted in the exhibition of characteristics that supported an ADD diagnosis, and there were also signs of secondary anxiety and significant symptoms of recurrent depression. (PageID.319.) It was recommended that Plaintiff contact his primary care physician for medication to treat his ADD and depression. (*Id.*)

During that year Plaintiff underwent a psychological assessment with Dr. Dennis E. Waite. At the examination Plaintiff was friendly and cooperative. There were no signs of anxiety or tension. Attention span and concentration were acceptable. Affect was appropriate and he was alert and oriented to time, place, and person. (PageID.593.) Testing results indicated, however, that Plaintiff was experiencing noticeable distress that impacted the effectiveness of his functioning.

ii.     *Period of Claimed Disability.*

Proceeding to the period of alleged disability, on July 11, 2011, Plaintiff saw Dr. Darren Killen, M.D., for a refill of his medications. Plaintiff wanted an increase of his prescription for Ritalin because he felt better with a higher dose. Under a range of symptoms, Plaintiff was positive for anxiety and Dr. Killen noted that Plaintiff had not taken medication for this impairment for years. Dr. Killen also stated Plaintiff had difficulty concentrating. (PageID.327.) An examination found Plaintiff to have an appropriate affect and demeanor, a normal speech pattern,

and grossly normal memory. (PageID.328.) The doctor increased the dosage of Plaintiff's Ritalin prescription. (PageID.328.)

In the fall of 2010, a few months before his alleged disability onset date, Plaintiff was arrested for bank fraud. (PageID.597.) While he was awaiting sentencing, he was referred by his attorney for a psychological examination with Dr. Gregory Sisk, which took place on November 4 and December 9, 2011, several months after his alleged disability onset date. Dr. Sisk noted that Plaintiff, who had been employed at a financial institution, had changed the name on returned checks to substitute the name of his mother. In total, Plaintiff funneled nearly $500,000 to his personal accounts. (PageID.597.) After testing, the doctor diagnosed Plaintiff with bipolar disorder, moderate and depressed type, as well as schizotypal personality disorder. He also assigned Plaintiff a GAF score of 50.[5] The doctor concluded that Plaintiff had suffered from a depressive type of mood disorder since his adolescence. Plaintiff's history also indicated a manic episode with a distinct and abnormal elevated mood, inflated self-esteem, decreased need for sleep, pressured speech, and excessive involvement in pleasurable activities. The doctor also noted that Plaintiff had signs of schizotypal personality disorder, which was a patten of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships. The doctor remarked that it was his opinion the bank fraud would not have occurred if Plaintiff was not in a manic episode. (PageID.606–607.)

Thereafter Plaintiff was placed in federal custody. While there, Plaintiff sought treatment for his mental disorders. At all times Plaintiff's GAF scores ranged between 51-70, which

---

[5] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM–IV–TR at 34.

indicated, at worst, Plaintiff had only moderate symptoms. On June 21, 2012, Plaintiff had no complaints. He said he was not depressed, but admitted to some difficulty sleeping as well as racing thoughts with some agitation at night. Dr. Richard Lepiane stated that Plaintiff did not seem anxious or nervous. (PageID.395.) Plaintiff was diagnosed with bipolar disorder and it was described as not improved. (PageID.397.) Plaintiff's depressive disorder was described as being stable on Fluoxetine. (PageID.397.) Again, during this time Plaintiff had a GAF score ranging from 51-70.[6] (PageID.397, 452.)

On July 9, 2012, Plaintiff wanted an increase in his Risperidone. (PageID.391.) Plaintiff was alert and oriented times three with an appropriate affect. (PageID.391.) Later that month, however, Plaintiff's depression was described as having worsened. Plaintiff reported having a lot of anxiety. He said he was on two different medications and wanted something else. He reported that a previous prescription for Bupropion had helped. (PageID.388–389.) Accordingly, Plaintiff was prescribed Wellbutrin (also known as Bupropion) to treat his depression. (PageID.464.) Two weeks later, Plaintiff reported a rash that he thought might be due to his Wellbutrin (PageID.382) and the following month Plaintiff requested that his morning dose be moved as he felt sick to his stomach when taking it. He noted, however, that when he took his dose after eating a meal, he did not feel sick, and Dr. Dunlop indicated that Plaintiff should take the medication after eating breakfast. (PageID.461.) Plaintiff also was given a lotion for his rash. (PageID.381.) On August 15, 2012, Plaintiff reported that the Wellbutrin kept him awake, but he did not want to stop

---

[6] As noted above, A score of 51-60 indicates that Plaintiff had "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV–TR at 34. Furthermore, a GAF score of 70 indicates "some mild symptoms or some difficulty in social, occupational, or school functioning, but [was] generally functioning pretty well [and had] some meaningful interpersonal relationships" (*Id.*)

it because it helped his anxiety. His racing thoughts were also calmed by the Risperidone. (PageID.366.) Plaintiff stated he felt much better. (PageID.363.) Plaintiff's depressive disorder was described as improved, but his other impairments were described as not improved or the same. (PageID.367.) His GAF scores continued to fall within the range of 51 to 70. (*Id.*)

On September 7, 2012, Plaintiff complained that he needed a change in his medication as he felt his depression had markedly increased. (PageID.460.) On October 11, 2012, Plaintiff reported that the Wellbutrin was not working and the depression was worse. Plaintiff reported that he had done very well with Prozac. (PageID.357.) Dr. Richard Lepiane prescribed Prozac and Trazodone to treat Plaintiff's depression. (PageID.458–459.) Thereafter, on December 20, 2012, Plaintiff reported he was doing well. He had trouble maintaining sleep, but had a good appetite. He got along well with others, and requested an increase in the Trazodone dosage. (PageID.343.) On February 22, 2013 and April 22, 2013, it was again noted that Plaintiff's GAF scores ranged between 51 to 70. (PageID.418, 422.)

After being released from federal custody, Plaintiff sought treatment for his mental impairments at Van Buren Community Mental Health. There, on July 17, 2013, Plaintiff was assessed by Tisha Benton. (PageID.547.) Plaintiff reported a history bipolar disorder, depression, and schizotypal personality disorder. He also spoke of his incarceration. Plaintiff reported that while he was employed at the bank, he had severe grandiosity and drank a lot of alcohol at clubs. Ms. Benton concluded that Plaintiff had mood fluctuations that affected his activity level. He had insomnia, panic attacks, social anxiety, paranoia, low self esteem and depression. Ms. Benton also noted that Plaintiff had a history of stopping his psychotropic medications and that he had given away large amounts of money and belongings during his manic phases. (PageID.547.) A mental

status examination found Plaintiff to be appropriately dressed and he appeared to be of average intellect. Plaintiff had a cooperative and anxious mood, as well as a primarily appropriate affect. His speech was normal for age and intellect, and his thought content was unremarkable but also paranoid. He was oriented to person, place, and time, and had good / fair insight. He also had a good / normal memory. (PageID.550–552.) After the examination, Plaintiff was given a GAF score of 34.[7] (PageID.554.) The assessment concluded that Plaintiff had a long history of severe mood swings ranging from being energetic and goal oriented to having a lack of motivation to do anything. He received his criminal conviction during a year long manic phase. It was also noted that during his manic phases he would run down the street in his underclothes. (PageID.556.)

On July 26, 2013, Ms. Linda Sobol from Van Burden Community Mental Health completed a treatment plan for Plaintiff. (PageID.541.) Plaintiff's goals were to stabilize his mood with the help of medication and to learn to cope more effectively with his anxiety and panic. His objectives were to develop a daily schedule and routine, identify activities that triggered his anxiety and panic, develop plans to cope with difficult situations, and learn relaxation and diversion techniques to aid coping. (PageID.541–544.)

On August 9, 2013, Plaintiff saw Ms. Sobol for an hour long individual therapy appointment. (PageID.539.) Plaintiff's mood and affect were anxious, he also had racing thoughts and agitated motor movement. (PageID.539.) Plaintiff described himself as identifying with a bipolar character in a movie he had recently watched. Ms. Sobol noted that Plaintiff reported he had

---

[7] A GAF score of 34 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM–IV–TR at 34.

a loose daily routine and would often skip showering and grooming. (PageID.539.) Ms. Sobol encouraged Plaintiff to work on adding these activities to his morning routine.

On August 23, 2013, Ms. Sobol described Plaintiff's mood, affect, thought process, orientation, behavior, and functioning all as unremarkable. (PageID.537.) Plaintiff admitted that he recognized the value of a routine, but while he had done well showering and grooming himself for four days since the prior appointment, during the other days he kept telling himself he would take care of himself later and would thereafter forget to do so. He also reported not sleeping more than four hours a night. He said his mother helped him recognize the symptoms of his irrational thinking and manic symptoms, and Ms. Sobol indicated he described OCD behavior. (PageID.537.)

On September 6, 2013, Ms. Sobol described Plaintiff's mood and affect as anxious and his behavior and functioning as being remarkable for agitated motor movement. His thought process and orientation were unremarkable, though Ms. Sobol noted Plaintiff had racing thoughts. (PageID.535.) Plaintiff reported being able to maintain a routine for seven out of the last fourteen days. For the other seven days, he had manic episodes and did not sleep for six nights. He reported he almost hurt his sister. He hated taking his medication, but admitted if he did not take the medication he would have to rely on his mother to stop him before he did something awful. He also admitted he did not have enough self awareness to recognize when his symptoms occurred. (PageID.535.)

On September 20, 2013, Ms. Sobol stated Plaintiff had an unremarkable mood, affect, thought process, orientation, behavior, and functioning. (PageID.533.) Plaintiff had experienced several sleepless nights, but did not call a crisis line because he was embarrassed and did not want anyone to think he was crazy. He reported he liked himself when he was in his manic stage because

he liked to be busy and productive. He also reported he had a panic attack at his niece's graduation. He was thinking about childhood memories of when his father was violent towards his mother. He told Ms. Sobol it was extremely difficult to leave the house, and even more difficult to go out shopping. (PageID.533.)

On October 4, 2013, Plaintiff's mood and affect were irritable and his thought process and orientation were scattered. Otherwise his behavior and functioning were unremarkable. (PageID.531.) Plaintiff told Ms. Sobol he had significant trouble sleeping. He was fearful of all people. He reported that he would continue to work towards establishing a daily schedule and routine. (PageID.531.)

Plaintiff had an initial psychiatric evaluation with Dr. Tatineni on October 10, 2013. (PageID.477.) Plaintiff complained of sleeplessness, high anxiety, panic, and irritability. Plaintiff reported that the Risperidone he had taken while in prison did not work and so the physician at the facility started him on Trazodone. (PageID.477.) Plaintiff reported that he did not trust people because of past abuse and he did not like to have any kind of interactions with people in general. (PageID.477.) A mental status examination revealed that Plaintiff was oriented to time, place and person, but not entirely to situation. His mood was dysphoric, depressed, and anxious. There was some mania, flight of ideation, and racing thoughts evident. But his memory was intact, and abstract and judgment were concrete. His insight, however, was very limited. (PageID.477–478.) Plaintiff was diagnosed with bipolar mood disorder, major depression, PTSD, and a personality disorder, and

assigned a GAF score of only 30.[8]  Dr. Tatineni prescribed Latuda and kept Plaintiff on his Prozac and Trazodone prescriptions.  He also prescribed Ativan for Plaintiff's anxiety.  (PageID.478.)

On October 18, 2013, Plaintiff's mood and affect were angry and manic, and he had racing thoughts.  (PageID.526.)  Plaintiff told Ms. Sobol his medications were not effective.  Plaintiff reported he was not sleeping much and had been cleaning obsessively.  Plaintiff reported that being around family, in large gatherings, and with people who had been drinking triggered escalating anxiety.  (PageID.527.)   At a medication review on October 24, 2013, Plaintiff's prescriptions for Latuda and Ativan were increased.  (PageID.525.)

On November 1, 2013, Ms. Sobol found Plaintiff had an unremarkable mood, affect, thought process, orientation, behavior, and functioning.  (PageID.523.)  Plaintiff discussed a past incident, when he was seven years old, during which time his step father hit him on the head with a baseball bat.  Plaintiff wondered if the blow to the head could have caused his condition, and his therapist advised him to speak about it with his primary care provider.  (PageID.523.)

On November 11, 2013, Plaintiff saw Ms. Jean Lafever, a physician's assistant at the Stagg Medical Center.  As Ms. Sobol had suggested, Plaintiff reported that he had previously been assaulted over the head with a baseball bat and his psychiatrist suggested he have an evaluation for a traumatic brain injury.  It does not appear, however, any injury was diagnosed or that Plaintiff received treatment for the condition.  Plaintiff also told Ms. Lafever he was nervous around men, especially if they were drinking.  He was also concerned about weight gain and swelling that occurred around the time he had increased the dosages of his psychiatric medications.  (PageID.498.)

---

[8] This score indicates "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM–IV–TR at 34.

On exam, he was oriented to person, place and time. He had a flat affect and flat speech. (PageID.499.) Ms. Lafever advised Plaintiff to talk to his psychiatrist about adjusting his psychiatric medications. (PageID.500.)

On November 15, 2013, Plaintiff's mood, affect, thought process, orientation, behavior, and functioning were unremarkable. (PageID.521.) Plaintiff told Ms. Sobol that the Ativan was not effective in modifying his anxiety. He felt that he had been doing better on a higher dosage of Trazadone. (PageID.521.) He also reported that having to shop by himself would trigger his anxiety and he was uncomfortable waiting in the therapist's crowded lobby. That said, Plaintiff reported he was maintaining a regular routine and Ms. Sobol indicated that Plaintiff appeared to be managing his anxiety reasonably well. (PageID.521.) At a November 21, 2013, medication review, however, Plaintiff reported he was not sleeping well. Plaintiff's Prozac dosage was decreased while his dosages for Trazodone and Latuda were increased. (PageID.520.)

On December 3, 2013, Plaintiff had another visit with Ms. Lafever. Plaintiff wanted to discuss his medications. He thought his psych medications were helping him sleep and that he was not anxious, but his mother thought he was now slow moving and that he would stumble. (PageID.491.) A physical exam confirmed Plaintiff was slow moving and would shuffle when he walked. (PageID.492.) Ms. Lafever advised Plaintiff to schedule an appointment with his psychiatrist. At a medication review dated January 2, 2014, it was noted that Linda Sobol described Plaintiff as "zoned out" during the last therapy appointment. In fact, he was so drowsy he was falling off the couch. Plaintiff's prescription for Trazodone was subsequently decreased. (PageID.518.)

On January 10, 2014, Plaintiff had a slowed thought process and orientation, but otherwise had an unremarkable mood, affect, behavior, and functioning. (PageID.516.) Plaintiff

reported to Ms. Sobol that spending time with people would trigger his anxiety. Though he was comfortable with his mother and her family, and enjoyed spending time with them, Plaintiff reported that, in general, he was anxious around people and that it kept him from doing all sorts of things. He admitted that this has changed somewhat since he was prescribed Klonopin. He was now able to grocery shop without a panic attack. But Plaintiff's mother was in the hospital with the flu and pneumonia, and she did not feel like Plaintiff could stay home alone because he was slow to react ever since he began taking Klonopin. His mother had asked Plaintiff's cousin and his cousin's girlfriend to stay with Plaintiff. Plaintiff felt that this was not necessary, but did not put up a fuss as he did not want to worry his mother. (PageID.516.)

On January 24, 2014, Plaintiff's mood and affect were tired and irritable, but his thought process, orientation, behavior, and functioning were unremarkable. (PageID.514.) Plaintiff reported significant difficulty focusing on anything, and he spent most of the day staring at the TV in an unfocused manner because he was tired and had no motivation to do anything. Plaintiff's mother was home from the hospital, and his sister was staying with them to help out. She was staying in Plaintiff's room, so Plaintiff felt that he did not have a place to retreat to when things became chaotic. He felt that he needed to be on Ritalin, but that no one would prescribe it to him. (PageID.514.)

On February 7, 2014, Plaintiff had an unremarkable mood, affect, thought process, orientation, behavior, and functioning. (PageID.512.) Plaintiff was described as being very mellow and laid back at the visit. He told Ms. Sobol that he would zone out and stare at a wall during the day. He wanted to be able to focus and complete a task, but was unable. Plaintiff said he could not remember things, even important phone messages. The therapist consulted with a psychiatrist, who

suggested that he cut back on the dosage of his Klonopin and start taking his Prozac in the morning. (PageID.512.) On February 17, 2014, Plaintiff was examined at the Stagg Medical Center for an abnormal blood count and a wart behind his right ear. (PageID.470.) Plaintiff reported to his examiner that Dr. Tatineni had lowered the dosage for his Trazodone prescription and that while he felt a little more anxious, he was not feeling as numb. (PageID.484.) At that visit, his behavior was described as normal. (PageID.485.)

On February 21, 2014, Plaintiff had an unremarkable mood, affect, thought process, orientation, behavior, and functioning. (PageID.510.) Despite these findings, Plaintiff reported that his sister was living with him and his mother, and that his sister triggered his anxiety. He reported a "mini-manic" episode where he cleaned frantically for three days. He felt that he was just sitting around and was stir crazy. The therapist discussed the importance of a routine, but while Plaintiff said he understood the importance of such a routine, he reported he did not have the energy to get moving. (PageID.510.)

On March 7, 2014, Plaintiff had an unremarkable mood and affect, but had a loose thought process and orientation and also had a relaxed behavior and functioning. Plaintiff felt that his medication did not seem to help, and Ms. Sobol noted he appeared to be drugged. (PageID.508.) Plaintiff reported he was sleeping more than he was awake because he did not have the energy or motivation to do anything. (PageID.509.) He further stated he continued to experience debilitating anxiety when he spoke to people he did not know well and that his visits with his probation officer also triggered his anxiety. (PageID.509.) Plaintiff reported that his primary trigger was his sister, who was still living with him and his mother. He was irritated by her voice and her interests. He said he worked hard to tune her out, and that this was why he slept so much. In the past he had

picked her up and thrown her off the porch. (PageID.509.) The therapist wrote that she tried to teach relaxation techniques, but that Plaintiff became so self-conscious it was difficult for him to practice with her. Plaintiff was unable to identify activities that he enjoyed that might have diverted his focus. He reported that he was looking forward to warmer weather so he could go outside and garden, but noted that he would not work outside if his neighbors were out as that triggered his anxiety. The one activity that he could focus on was putting his home in order, but the therapist noted that this activity could often lead to mania. (PageID.509.)

At a March 13, 2014, medication review, Plaintiff's prescribed dosages for Klonopin and Latuda were decreased. (PageID.622.) It was noted that Plaintiff was feeling drowsy when he was driving. (PageID.622.) On March 21, 2014, Plaintiff's mood, affect, thought process, orientation, behavior, and functioning were unremarkable. (PageID.620.) He reported that his mother was scheduled for knee surgery and that this meant his sister would continue to stay with them. Plaintiff told Ms. Sobol he could hardly stand to be around his sister and was worried about how he would get around. He reported trouble falling asleep after a medication adjustment. It was noted that Plaintiff was "developing" a regular schedule and routine. (PageID.620.)

On April 4, 2014, Plaintiff's mood and affect were described as mildly depressed and his thought process and orientation were described as dulled. His behavior and functioning were also described as foggy. (PageID.618.) Plaintiff appeared slow and "bemused." He was only getting five to six hours of sleep each night. He spent most of the day not doing anything. The therapist discussed possible activities that Plaintiff could busy himself with. Plaintiff reported that he liked to garden and that he would like to do some spring cleaning, so long as his neighbors were not around. He told Ms. Sobol he would work at researching and planning the garden. He also reported

that he had recently completed a large puzzle with his mother and that this helped with his boredom (PageID.619.) Plaintiff had rejected his probation officer's suggestion that he do some volunteer work, and his therapist supported this suggestion because she agreed Plaintiff was uncomfortable in the presence of strangers. Instead, she suggested exploring other opportunities to socialize. (PageID.619.) At an April 10, 2014, mediation review, Plaintiff's prescription for Prozac was increased. (PageID.617.)

On April 14, 2014, Plaintiff's mood and affect were anxious and depressed, and his thought process and orientation were slowed. (PageID.615.) Plaintiff reported he was almost too tired to speak with the therapist. He said he did help with some yard work the day before and worked in the yard for a couple of hours. (PageID.615.) The triggers of his anxiety had not changed. He reported he had also helped take down some Christmas lights and was proud of that. Ms. Sobol also noted, however, that there had been some manic episodes.

On May 2, 2014, Plaintiff had a depressed mood and affect, a sluggish thought process and orientation, and he had no energy. (PageID.613.) Plaintiff reported he could not get motivated to do anything. He would just sit and dwell on his problems. He said he did almost nothing during the day and that nothing interested him. He felt that when the weather warmed up, he would likely "flip the switch" and start feeling better. (PageID.613.)

On May 20, 2014, Plaintiff's mood and affect were depressed, and his thought process and orientation were sluggish. (PageID.611.) Plaintiff reported he was feeling depressed. And he had had lost interest in activities he had once enjoyed, such as video games. He said he would like to go outside and work on the flower beds, but that "I just can't get over the hump!" (PageID.611.) The therapist noted that Plaintiff reported a lack of energy and also felt restless. (PageID.611.)

On June 3, 2014, Plaintiff had an unremarkable mood, affect, thought process, orientation, behavior, and functioning. (PageID.609.) Ms. Sobol wrote that Plaintiff had no energy and no motivation. He just sat with a "kind of half smile." (PageID.609.) He said he did nothing when he was at home, and that his mother had to pay their neighbor to mow the yard. He reported racing thoughts and that his sister intruded on the calm lifestyle he had with his mother. He said her behavior made him very anxious. (PageID.609.)

At a June 12, 2014, medication review, Plaintiff reported no interest in any activities. The prescribed dosage of Plaintiff's Latuda was decreased and the doctor increased Plaintiff's prescribed dosage of Prozac. (PageID.676.) On June 17, 2014, Plaintiff's mood and affect were bored, his thought process and orientation were sluggish, and his behavior and functioning were restless. (PageID.674.) Plaintiff reported that he coped with difficult situations by staying quiet and not talking to anyone. He disliked groups of people and family gatherings and avoided them whenever possible. He felt that he just sat around all day doing nothing. (PageID.674.)

On July 1, 2014, Plaintiff's mood, affect, thought process, orientation, behavior, and functioning were all unremarkable. (PageID.672.) Plaintiff reported staying in touch with a friend out east and he had also contacted a friend in Missouri. Plaintiff had dreams about moving back there. Plaintiff had done some work in his garden, but a storm had torn it up so he said he would spend the next few days replanting. He had also gone swimming with his cousin. Ms. Sobol noted that Plaintiff had benefitted from a decrease in the dosage in the amount of Latuda he was taking and stated he was getting some motivation and energy back. (PageID.672.)

On July 22, 2014, Ms. Sobol performed an assessment of Plaintiff. She noted that Plaintiff reported being anxious and depressed for as long as he could remember. (PageID.661.) Ms. Sobol summarized Plaintiff's treatment history since October 2013 as follows:

> In October 2013 Ronald reported that he was sleeping very little as he clean[ed] obsessively. He reported that when he cleaned his room he would remove everything from the room including the pictures on the wall. He would then clean top to bottom then throughly clean each item and piece of furniture before returning to his room. In addition he reported that he waxed everything but the mirror in the bathroom. His medication was changed as a result and now he spends the majority of his time sitting and watching television or just staring into space. Until his medication was reduced he fell off the couch twice and attempted to drive but missed a curve in the road and "barreled up a neighbor's drive way.["] He continues to report anxiety in crowded places and anxious discomfort sitting in the lobby when coming to therapy. He states that he cannot shop independently due to anxiety. He used to enjoy gardening but has lost interest. He avoid family gathering[s] when possible. He does not socialize except by phone and then only infrequently. He sleeps well, thanks to his medication, and goes to bed early, sleeping for 10-12 hours a night. He neglects his self-care and grooming unless he is scheduled to go [to] an appointment. He does not contribute to household maintenance. He worries that if his medication is changed he will become manic again but he misses having the energy he once had.

(PageID.661.) An examination found Plaintiff to be neat, clean, and appropriately dressed. He had a cooperative mood, but was anxious and depressed. His affect was restricted and blunted. He had poor insight. His behavior and motor activity were slowed and lethargic, but he had a good memory, his thought content was unremarkable, and he was oriented to person, place, and time. (PageID.665–666.) He was assigned a GAF score of 33.[9] The next day he was evaluated by Ms. Lafever. She noted that Plaintiff had very slow speech and movement. (PageID.723.)

---

[9] This score indicates "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM–IV–TR at 34.

On September 5, 2014, Plaintiff's mood, affect, thought process, orientation, behavior, and functioning were all unremarkable. Plaintiff reported that he had been increasingly more social since his last visit. He realized he would never get to know his sister if he did not listen to her stories. He also was able to get to know his sister's husband and found that they had a lot incommon. Plaintiff also told Ms. Sobol he had been driving and was focusing on driving safely. (PageID.650.)

On October 9, 2014, Plaintiff's mood and affect were anxious, and he had racing thoughts. (PageID.645.) Plaintiff reported his brother-in-law had pulled a gun on his sister and his sister was now staying with Plaintiff and his mother. Plaintiff stated he was making an effort to get to know his sister. When he got overwhelmed he would put on his headphones and watch a movie on his computer. Plaintiff reported anxiety with a new probation officer. The officer had counted Plaintiff's pills and told Plaintiff he was not taking the correct dosage. (PageID.645.) At a medication review the same date, Plaintiff continued to report depression and anxiety but that his medications were helpful. (PageID.647.)

On October 24, 2014, Plaintiff's mood and affect were anxious and he had racing thoughts. (PageID.643.) Plaintiff felt that he was on edge with his new probation officer. He was unable to respond to questions the officer asked him because of his anxiety. He was worried that the officer would think he was not taking his medications as prescribed. (PageID.643.) He said that his mother no longer allowed him to drive. She would cook, clean, and take care of him and he did nothing. The therapist stated that his mother was enabling Plaintiff to remain passive and dependent, and encouraged him to speak with his mother about that. (PageID.643.)

On November 7, 2014, Plaintiff had a depressed mood and affect, but his thought process, orientation, behavior, and functioning were otherwise normal. (PageID.641.) Plaintiff's cousin drove him to the appointment because Plaintiff's mother was afraid to let him drive. He was unsure why she did not want him to drive, but said that it was perhaps because she thought he drove too fast. Ms. Sobol described Plaintiff as sluggish without much energy. He would sit around all day. He was depressed and feeling hopeless. (PageID.641.)

On a November 21, 2014, treatment plan addendum, Ms. Sobol wrote that Plaintiff did not trust anyone except his mother. He would speak openly in session and would talk on the phone with an old friend, but he still did not like to leave his home. Plaintiff appeared to be overmedicated, but was reluctant to decrease his medications because he did not want to experience a manic episode. Plaintiff frequently relied on his mother to solve his problems. He was stressed about upcoming family reunions. While he was close with family members, he also avoided them. It was noted that Plaintiff could go a week without bathing due to his depressed mood and that he also neglected grooming at times due to his mood issues. (PageID.637.)

On December 5, 2014, Plaintiff's mood and affect were mildly depressed and Plaintiff's behavior and functioning were lethargic. (PageID.633.) Plaintiff said he was too tired to drive, and so he asked his cousin to drive him to the appointment. He reported helping his mother put up Christmas lights and other decorations for the holidays. He helped with general housekeeping, but not much else. He continued to stare off into space, and reported he was tired of being tired. (PageID.633.) Plaintiff reported he was getting to know his cousin better, but found that she was self-centered and would get mixed up into dysfunctional relationships, and that she would

go out and party and use drugs and alcohol.  He reported he liked to watch his family members and ask himself how he would handle their situations.  (PageID.633.)

*D.       Conclusion.*

The Court concludes the ALJ's determination that Dr. Tatineni's opinion is inconsistent with the treatment records is not supported by substantial evidence.  The Court recognizes the substantial evidence standard is a deferential one, and that "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *See Jones*, 336 F.3d at 477.  But on this record, the ALJ has described Plaintiff's abilities much differently than what is actually supported in the record and in Dr. Tatineni's report.  The ALJ's observation, for example, that Plaintiff was maintaining a regular routine by November 15, 2013, appears to depend entirely on an isolated report that ignores Ms. Sobol's later notes recording that Plaintiff continued to struggle with motivation as well as regular showering and grooming.

The ALJ also depends upon records where Plaintiff was able to garden for a few hours, help put up decorations, or go swimming with his cousin as evidence that the doctor's conclusions were not well supported.  But these minimal activities are not inconsistent with the doctor's opinion.  Moreover, it is well established that the fact that a claimant is able to perform a limited range of activity for short periods of time is not inconsistent with a claim of disability. *See, e.g.*, *Leos v. Comm'r of Soc. Sec.*, 1996 WL 659463 at *2 (6th Cir.1996); *Wright v. Sullivan*, 900 F.2d 675, 682 (3d Cir.1990) ("sporadic or transitory activity does not disprove disability"); *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir.1989) (to be found unable to engage in substantial

gainful activity the claimant need not "vegetate in a dark room" or be a "total basket case"). In support of his conclusion, the ALJ relied on a very small portion of the medical record. An assessment of the entire record contrasts with the ALJ's conclusions. Accordingly, this matter will be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further evaluation of Dr. Tatineni's January 5, 2015 opinion.

### 2. Other Issues.

Plaintiff makes a number of additional arguments concerning the listing of impairments and his RFC. Because the ALJ's decision regarding these issues depended, in part, on a faulty analysis of Dr. Tatineni's opinion, the Court need not reach these arguments. Moreover, because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence in support of the ALJ's step five conclusion. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (noting that while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such questions must accurately portray the claimant's impairments).

### 3. Remand is Appropriate.

Finally, while the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if "all essential factual issues have been resolved" and "the record adequately establishes [his] entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 644 (6th Cir. 2013). This latter requirement is satisfied "where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176; *see also Brooks*, 531 F. App'x at 644. Evaluation of Plaintiff's

claim requires the resolution of certain factual disputes which this Court is neither competent nor authorized to undertake in the first instance. Moreover, there does not exist compelling evidence that Plaintiff is disabled. Accordingly, this matter must be remanded for further administrative action.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **REVERSED** and the matter **REMANDED** for further factual findings including, but not necessarily limited to, further evaluation of Dr. Tatineni's January 5, 2015 opinion, under the treating physician doctrine.

A separate judgment shall issue.


Dated:     July 13, 2017            /s/ Robert J. Jonker                        
                                    ROBERT J. JONKER
                                    CHIEF UNITED STATES DISTRICT JUDGE